IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM MCLAUGHLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 19-422 |
| | ) | |
| MICHAEL ZAVADA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Plaintiff William McLaughlin, a prisoner currently incarcerated at the State Correctional Institution at Benner Township, Pennsylvania ("SCI Benner"), brings this *pro se* civil rights action under 42 U.S.C. § 1983. He asserts claims under the First, Eighth and Fourteenth Amendments to the United States Constitution arising out of conditions to which he was allegedly subjected in 2017 while incarcerated at the Fayette County Prison ("FCP") in Fayette County, Pennsylvania. The remaining defendants are Brian S. Miller, the Warden of the FCP, Michael Zavada, the Deputy Warden, Lt. Smith and Lt. Lenkey, both of whom are correctional officers, and Fayette County.

Pending before the Court is Defendants' motion for summary judgment. For the reasons below, Defendants' motion for summary judgment will be granted only to the extent that Plaintiff's Fourteenth and Eighth Amendment claims are based on his claims related to overcrowded conditions, his temporary housing at the beginning of his incarceration and inadequate lighting, and denied in all other respects.[1]

## I.     Relevant Procedural History

Plaintiff originally commenced this action in the Middle District of Pennsylvania. After it

---

[1] The parties have fully consented to jurisdiction by a magistrate judge.

was transferred to this Court, he filed an Amended Complaint (ECF No. 48). Defendants moved to dismiss both the Complaint and the Amended Complaint. On both occasions, Plaintiff responded with a motion for leave to amend, which was granted. He then filed a Second Amended Complaint ("SAC"). (ECF No. 74).

After Defendants filed a partial motion to dismiss the SAC, Plaintiff requested leave to file a Third Amended Complaint ("TAC") to insert a page missing from the SAC. His motion was granted, and the TAC was filed. (ECF No. 89.)[2] The Court did not dismiss the partial motion to dismiss as moot but indicated that Defendants could file a supplemental brief and they later did so.

On May 14, 2020, the Court issued a Memorandum Opinion and Order (ECF Nos. 92, 93), which granted in part and denied in part Defendants' partial motion to dismiss. As a result, the remaining claims are Plaintiff's Eighth Amendment and Fourteenth Amendment claims against Fayette County and Defendants Zavada, Miller, Smith and Lenkey in their individual capacities relating to the conditions of confinement at the FCP, and a First Amendment retaliation claim against Defendant Zavada.

Defendants have now filed a motion for summary judgment (ECF No. 117) which has been fully briefed (ECF Nos. 118, 125, 126.)

---

[2] As Plaintiff's Amended Complaint was verified (ECF No. 48 at 12) it may be treated as an affidavit for purposes of summary judgment. *See Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 443 (3d Cir. 2020). Although he did not verify the SAC and TAC, many of the allegations in these pleadings are identical to the allegations in the Amended Complaint. Plaintiff also verified his response to Defendants' motion. (ECF No. 125 at 4.)

## II.    Factual Background[3]

Plaintiff was incarcerated in the FCP on March 8, 2017 after his arrest on charges of aggravated assault, robbery and other lesser offenses. He pleaded guilty to the charges on August 4, 2017 and was sentenced on September 11, 2017, after which he was transferred from the FCP to SCI Greene on September 28, 2017. Plaintiff is currently incarcerated at SCI Benner with an expected release date in September 2029. (Defendants' Concise Statement of Undisputed Material Facts ("DCSUMF") ¶¶ 1, 3-4, 8.)[4]

When Plaintiff entered the FCP, he was housed in the C Range on the second floor of the jail. At first, he was not assigned to a cell. Rather, Plaintiff was assigned to a cot in the common area in front of the range. The cot was several inches off the floor and included a mattress. During the time that Plaintiff had to use a cot, Cell 5 was left open so that inmates without a cell could use the facilities and toilet. (*Id.* ¶¶ 10-12.) At some point after that, Plaintiff was moved from a cot to a cell on C Range.[5]

A leak ran down the walls between Cells 10 and 11 in the C Range and affected Cell 11. Plaintiff was not in that cell, but the leak ran across the floor. (*Id.* ¶¶ 13-14.) According to Plaintiff, it was never fixed. (McLaughlin Dep. (ECF No. 120 Ex. 1) 22:8-17.) He told Defendant Smith

---

[3] Some of the facts set forth in this section are taken from Defendants' Concise Statement of Material Facts, but only when they are admissible or supported by the record. Other facts are based upon Plaintiff's deposition testimony or his sworn pleadings. In their reply brief, Defendants contend that because Plaintiff did not respond to their concise statement in compliance with Local Rule 56, all of their facts should be deemed admitted. LCvR 56.E. However, given Plaintiff's *pro se* status and his own verified submissions and sworn deposition testimony, the Court will examine the entire record to determine what facts are undisputed.

[4] ECF No. 119.

[5] Defendants state that this occurred on March 18, 2017 and that he was moved to Cell 6. The Offender Management System Report (ECF No. 125 Ex. D) appears to suggest that he was not moved from the common area to a cell until April 4, 2017 and was lodged in Cell 7. This difference is not material to the resolution of Defendants' motion.

about this, who said he was aware of it and "everybody knows about it." (*Id.* at 22:18-23:5; *see also* 28:6-21.)

There were leeches in the sink of Cell 11 and according to Plaintiff, leeches came up through the shower drain in the C Range. There were also insects around the mop sink in the shower area. Plaintiff claims he specifically told correctional officers about the presence of insects. (*Id.* ¶¶ 15-16.) On at least one occasion, Plaintiff saw someone fumigating C Range for insects. (DCSUMF ¶ 17.)[6] Plaintiff claims that he was exposed to vermin and their excrement, and that his bedding was infested with vermin and vermin excrement. (Am. Compl. ¶¶ 28-29; TAC ¶¶ 51-52.)

In early June 2017, after Plaintiff was "sucker punched" by another inmate, he was moved from C Range to the Special Management Unit ("SMU") in the basement of the FCP. The SMU is used for protection of inmates or as a place to house inmates who need to be separated from other inmates. Lt. Smith asked Plaintiff why he was housed in the SMU and Plaintiff said he did not know. Lt. Smith later reported to him that when asked, Deputy Warden Zavada told him that Plaintiff was housed there because he is an "asshole." Plaintiff and Deputy Warden Zavada were involved in an altercation during Plaintiff's incarceration twenty years earlier. In contrast, Officer

---

[6] Defendants state that the prison is fumigated monthly. (*Id.* ¶ 18.) This statement is based on unauthenticated pest control records provided in Defendants' Appendix. Plaintiff objects to the use of these records because Defendants did not produce them (ECF No. 125 at 2-3). In its Case Management Order (ECF No. 97) the Court directed that Defendants produce, among other things, all documents in their possession about the alleged incidents described in the Complaint, as well as all records in their possession that relate to Plaintiff's claims. Defendants contend that the order required them only to provide "incident" reports, not invoices, and that they did not learn until Plaintiff's deposition on August 17, 2020 that these invoices are relevant to his claims. Although they had a continuing obligation after Plaintiff's deposition to produce relevant documents and were on notice that they could relate to Plaintiffs' claims, they did not produce these invoices. This is not simply an issue of Plaintiff's belated discovery request as referenced in Defendants' response. Simply put, Defendants had an obligation to produce all relevant documents, including those on which they intend to rely in their defense. Thus, these documents may not be relied on by Defendants as a basis for summary judgment.

Yasko told Plaintiff he was being kept in the SMU to avoid further injury to his nose. (*Id.* ¶¶ 25-27.)

Plaintiff complained about his toilet not working to the correctional officers and nurses with whom he came in contact. There was liquid in Plaintiff's cell that he believed was mainly urine from a leaking toilet. While lodged in this cell, Plaintiff experienced a rash on his foot that he attributes to exposure to these leaks. On June 15, 2017, Plaintiff told a nurse that he would not eat or take medication. (DCSUMF ¶¶ 28-30.) The next day, Plaintiff was moved to the end cell in the SMU. After he was moved to this cell, Plaintiff began eating and taking his medication again. (*Id.* ¶¶ 28, 31-32.) When Plaintiff was moved to the end cell, he noticed a used colostomy bag in the cell. He brought it to the attention of a nurse, who "shortly thereafter" brought Plaintiff cleaning supplies. Plaintiff cleaned the cell and removed the bag. (*Id.* ¶ 33.)

Plaintiff had surgery to repair the broken nose he sustained when he was punched and was housed for medical purposes in the front holding cell on the main level of the jail from June 22, 2017 until July 7, 2017. On July 7, 2017, Plaintiff was moved back to the basement and lodged in an intake cell. (*Id.* ¶¶ 34-36.) Several weeks later, Plaintiff got into a fight with inmate Cory Rose. As a result of this incident, Plaintiff was sentenced to twenty days in disciplinary holding but remained housed in an intake cell. (*Id.* ¶ 37.)

Contraband was found in Plaintiff's cell and he was sentenced to twenty days in the SMU beginning on August 8, 2017. (*Id.* ¶¶ 40-41.) During that time, Plaintiff shared a cell with inmate Harry Neil. When Plaintiff arrived in the cell on a Sunday night, the toilet was full of "feces [and] urine." When Plaintiff asked Neil where he was going to the bathroom, he replied "on the floor." On Monday morning, Plaintiff complained to Nurse Jordan and Correctional Officer Wadsworth. Later that day, Roto-Rooter fixed the toilet. (*Id.* ¶¶ 42-45.)

According to Defendants, while Plaintiff was in the SMU, there were occasions when the toilet did not work, but it would be fixed. If the toilet was not working in a cell, inmates were transported to another unit to use the bathroom. (*Id.* ¶ 38.)[7]

On August 28, 2017, Plaintiff was moved back to C Range. He remained there until he was transferred from the FCP to SCI Greene on September 28, 2017.

Defendants assert that the jail experienced problems with the toilets on September 5, 2017. Because the toilets were not working, inmates had to relieve themselves in plastic bags. (*Id.* ¶¶ 46-48.)[8] There were intermittent times when the toilets would work and then would break again. Eventually, according to Plaintiff, the "band aids weren't working" and they had to fix the whole situation by shutting down the system. (*Id.* ¶¶ 50-51.) The next day, the jail brought in port-a-potties and hand sanitizer.[9] When the toilets were not working, inmates were taken to the yard to use the portable toilets. The water would be turned on and off at certain times. The jail also brought in water for inmates to drink. Inmates could use the toilets and the jail engaged in controlled flushes to empty the toilets every three to four hours. (*Id.* ¶¶ 52-55.)

---

[7] Defendants state that on July 24, 2017 and July 27, 2017, they performed maintenance to unclog a sewer line. (*Id.* ¶ 39.) However, this statement hinges on plumbing records to which Plaintiff has objected because they were not produced to him during discovery. In previously opposing Plaintiff's request for these records, Defendants contended, among other things, that producing documents regarding plumbing maintenance was "overly burdensome, irrelevant and therefore, not proportional to the needs of the case." (ECF No. 113 at p. 4.) Defendants cannot object to producing documents on the grounds of relevance and then attempt to rely on them in their defense. As a result, these documents cannot be used by Defendants to support their motion. *See* supra n.6.

[8] Defendants state that the plumbing problems resulted from inmates flushing objects down the toilets (*Id.* ¶ 49). However, they rely on the plumbing records which were not produced to Plaintiff. Moreover, even assuming that this was the cause, they do not indicate what, if any, efforts were undertaken to stop this practice, nor have they suggested that Plaintiff engaged in this practice.

[9] Defendants have attached the invoice for the port-a-potties to their Appendix but had claimed earlier in this case that producing these documents was "overly burdensome, irrelevant and therefore, not proportional to the needs of the case." *See* supra n.7. That said, as Plaintiff testified about the port-a-potties in his deposition, this fact is undisputed.

The parties substantially diverge with respect to the sanitary conditions in the jail. Defendants describe any problems as *de minimis* and quickly remedied. When asked during his deposition about the nature of his claims, however, Plaintiff testified under oath as follows:

> Basically I was housed in the SMU, in a cell with a leaky toilet, and it just constantly ran and puddled on the floor. The cell was previously used for garbage storage and then they had quite a few plumbing issues at Fayette County to where the sewer backed up through the system and being that the SMU is located in the basement, the raw sewage come out up through the drains on the floor and there was raw sewage in the cell for a period of time and it was just—it was hard to get cleaning supplies to clean things up. Sometimes you couldn't even clean things up. We couldn't use the toilet for days on end, had a plastic garbage bag over it. And this went off and on; they would fix it, it would reoccur, they'd fix it, it reoccurred.
>
> And then when I moved out of the SMU up to C block, the plumbing problems were still there. We had to go to the bathroom in plastic bags and there was always sewage running from the upstairs cell down to C block, across the floor. That's been going on for, I don't know how long, quite a while, just very unsanitary conditions. There was leeches coming up through the drains.
>
> This has all been reported over and over again, filing grievances, along with other people, I'm not alone.

(McLaughlin Dep. (ECF No. 120 Ex. 1) 13:23-14:24.)[10]

Plaintiff testified that the smell in the C Range was so foul that one of the correctional officers put Lysol on a rag and then attempted to use it as a mask. Further, at times the floors were covered with feces and there was standing water consisting of urine in his cell. The union asked for new boots due the presence of feces and urine on the floors. (ECF No. 120 Ex. G at 11.) During his deposition, Plaintiff testified that "every time you would get off the bed and try to sit up, put your feet on the floor, you were in sewage, leakage from the toilet. And this was actually before

---

[10] Plaintiff attached to his response the Complaint that was filed in *Arison v. Fayette County*, Civ. A. No. 18-cv-845 (W.D. Pa. filed June 26, 2018). This case is a putative class action filed by the American Civil Liberties Union on behalf of prisoners who allegedly experienced unsanitary and unsafe conditions at the FCP. The case is pending before Magistrate Judge Kelly. Defendants correctly argue that Plaintiff cannot rely on the contested allegations in *Arison.*

the problem got bad. This was just a constant thing, much like the C block situation." (McLaughlin Dep. (ECF No. 120 Ex. 1) 34:10-15.) *See also* ECF No. 120 Ex. G at 8 (Plaintiff's notes, in which he describes climbing from the bed to a chair to a table to avoid placing his feet on the feces-covered floor).

Plaintiff had no interactions with Warden Miller or Deputy Warden Zavada during this incarceration at the FCP. (*Id.* ¶¶ 6-7.) Plaintiff testified that Lt. Smith was "a truly great guy" and asked Plaintiff how he could help. According to Plaintiff, while there was only so much Lt. Smith could do, he managed to get Plaintiff's cell moved once. Plaintiff testified that Lt. Lenkey was sympathetic about Plaintiff's situation, but there "was only so much he could do ... without going to the top." The parties dispute whether Plaintiff complained directly to Lt. Lenkey. (*Id.* ¶¶ 56-59; McLaughlin Dep. 78:13-19.) According to Plaintiff, both Lt. Smith and Lt. Lenkey were aware of the plumbing problems. (McLaughlin Dep. (ECF No. 120 Ex. 1) 22:18-23:5; 28:6-21;49:1-17; 76:25-77:2.) Plaintiff also asserts that both officers had the power to move him to a different cell. (*Id.* at 77:3-20.)

Although Plaintiff was asked about the grievance process at the FCP during his deposition and provided his understanding, Defendants did not submit any evidence that confirms the existence of a grievance policy at the FCP or describes the process for submitting or addressing a grievance.

The record does reflect that Plaintiff submitted several grievances during his incarceration at the FCP. He submitted grievances about his medication and about the conditions of C Range. Plaintiff also submitted a grievance about the leaking toilet in the SMU. According to Plaintiff, he did not receive a response to any of these grievances. (*Id.* ¶¶ 60-62.)

### III.  Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. Once that burden is met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record is taken as presented by the moving party and judgment as a matter of law will be entered. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001). As noted above, the Court will also treat Plaintiff's verified Amended Complaint as an affidavit for purposes of summary judgment and will consider Plaintiff's notes, which both Plaintiff and Defendants have made part of the record. *See also Giles*

*v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) ("an inmate who is proceeding pro se, is in a decidedly difficult position from which to generate 'record evidence' on his behalf ... under these circumstances, his affidavits ... are about the best that can be expected from him [at the summary judgment phase of] the proceedings.")

## IV.    Discussion

As set forth in 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

### A.    Fourteenth Amendment Claim

Plaintiff alleges a violation of his rights under the Eighth Amendment, which protects prisoners from "cruel and unusual punishment." His claim arises out of the conditions at the FCP. The Eighth Amendment applies to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989)).

The Court of Appeals has held, however, that "the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.'" *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) ("*Hubbard I*") (footnote omitted) (quoting *Graham*, 490 U.S. at 392 n.6). *See also Murray v. Keen*, 763 F. App'x 253, 255 (3d Cir. 2019) ("sentenced prisoners are protected only from punishment that is 'cruel and unusual' while pretrial detainees are protected from any punishment") (citing *Hubbard I,* 399 F.3d at 166-67)).

Plaintiff was a pretrial detainee during most of his incarceration at the FCP but after he was convicted and then sentenced on September 11, 2017, his status for the remainder of his incarceration at the FCP, ending on September 28, 2017, was as a convicted prisoner.[11] Because Plaintiff was a pretrial detainee for nearly the entire time that he was incarcerated at FCP, the Court primarily will apply the Fourteenth Amendment standard for evaluating his claims.

In *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979), the Supreme Court established the principle that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." In determining what constitutes "punishment," the Court stated that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* at 539. In making the determination of whether a challenged condition of confinement amounts to a punishment of a pretrial detainee, "'[a] court must decide whether the

---

[11] In the Memorandum Opinion issues with respect to Defendants' motion to dismiss (ECF No. 92 at 7), the Court stated that, although Plaintiff raised a claim under the Eighth Amendment based on the prison conditions, he failed to state claims under the equal protection and due process clauses of the Fourteenth Amendment. To the extent that this comment could be construed to bar Plaintiff's substantive due process claim (as opposed to a procedural due process claim), it was in error, as Plaintiff was a pretrial detainee for most of his incarceration at the FCP. Further it does not bar this claim. In its Order (ECF No. 93), the Court did not dismiss any Fourteenth Amendment claims. Moreover, Defendants acknowledge that Plaintiff was a pretrial detainee during most of his incarceration at the FCP and seek judgment in their favor with respect to both Amendments.

disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) ("*Hubbard II*") (quoting *Bell*, 441 U.S. at 538) "[C]onditions that are reasonably related to a penal institution's interest in maintaining jail security typically pass constitutional muster." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (citing *Bell*, 441 U.S. at 540).

In contrast, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Id.* (internal quotations and citations omitted); *see also Hubbard II*, 538 F.3d at 232. The "excessiveness" analysis requires courts to consider the totality of the circumstances, including "the size of the detainee's living space, the length of confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." *Hubbard II*, 538 F.3d at 233.[12]

In addressing a Fourteenth Amendment claim related to excessive force, the Supreme Court held that:

> [T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. For one thing, it is consistent with our precedent. We have said that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. 386, 395, n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443. And in *Bell*, we explained that such "punishment" can consist of actions taken with an "expressed intent to punish." 441 U.S. 538, 99 S.Ct. 1861, 60 L.Ed.2d 447. But the *Bell* Court went on to explain that, in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate non-punitive governmental purpose" or that the actions "appear excessive in relation to that purpose." *Id.*, at 561, 99 S.Ct. 1861. The *Bell* Court applied this latter objective

---

[12] Defendants contend that Plaintiff must show that the conditions of his confinement "shock the conscience," citing *Hubbard II*. This is not the appropriate standard for a pretrial detainee's due process claim arising out of conditions of confinement, however.

standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking.

*Kingsley v. Hendrickson*, 576 U.S. 379, 397-98 (2015).

Although *Kingsley* was an excessive force case, a growing number of courts have held that the same standard applies to other Fourteenth Amendment contexts, including denial of medical care and conditions of confinement claims. *See Kedra v. Schroeter*, 876 F.3d 424, 438 (3d Cir. 2017) (substantive due process claim arising out of an accidental shooting*). See also Hardeman v. Curran*, 933 F.3d 816, 822-23 (7th Cir. 2019) (lack of access to water); *Colbruno v. Kessler*, 928 F.3d 1155, 1161-63 (10th Cir. 2019); *Gordon v. County of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018) (medical needs); *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) (overcrowding and eight other types of degrading conditions of confinement); *Castro v. County of L.A.*, 833 F.3d 1060, 1070-71 (9th Cir. 2016) (en banc).

The Court of Appeals has "defined deliberate indifference as requiring a "conscious disregard of a substantial risk of serious harm." That is, "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." *L.R. v. School Dist. of Philadelphia*, 836 F.3d 235, 246 (3d Cir. 2016) (footnotes omitted). In *L.R.*, because the teacher's conduct in releasing a child to a stranger was "so obvious" that it rose to the level of deliberate indifference, it satisfied the objective standard of the Fourteenth Amendment substantive due process clause. *See also Darnell*, 849 F.3d at 29 (for purposes of a pretrial detainee's conditions of confinement claims, the deliberate indifference inquiry should be defined objectively rather than subjectively).

Defendants have separately analyzed each of Plaintiff's complaints about the conditions of his confinement and argued for the dismissal of each individually. That said, the Supreme Court has held that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation

'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). *See also Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (giving a prisoner only a "paper like" covering rather than clothing, placing him in a cold cell and exposing him to constant bright lighting for four days were "mutually enforcing conditions" all of which deprived him of the ability to sleep). The same principle applies in Fourteenth Amendment conditions of confinement cases. *See Darnell*, 849 F.3d at 30.

Here, the majority of Plaintiff's allegations relate to a single identifiable human need of safe and sanitary conditions. Thus, while all of the conditions cited by Plaintiff will be examined, the focus of the Court's inquiry will be on whether Plaintiff experienced unsanitary and unsafe conditions while detained in the Fayette County Prison.[13]

    1.   Conditions of Confinement

The record reflects that when Plaintiff entered the jail, he was housed in the C Range on the second floor. Due to overcrowded conditions, he was housed on a cot in the common area for a short time period which, based on disputed facts, was either for ten days or approximately one

---

[13] Plaintiff cites to the lack of sufficient lighting in this cell as a constitutional violation. Some federal courts have held that the constitutional requirement of adequate shelter for a prisoner includes adequate lighting. *See, e.g., Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985) *Gates v. Cook,* 376 F.3d 323, 341-42 (5th Cir. 2004); *Carney v. Craven*, 40 F. App'x 48, 51 (6th Cir. 2002). The Third Circuit has not recognized such claims. *See Fantone v. Herbik*, 528 F. App'x 123, 126-28 (3d Cir. 2013) ("constant illumination" claim did not violate Eighth Amendment). While Plaintiff has stated that the lighting in the basement was so poor that he could not see, the lack of lighting does not meet the "objective prong" showing that it was serious enough to constitute an objective deprivation of the right to due process, nor can it be combined with his claims which relate to the need for safe and sanitary conditions. Thus, to the extent that Plaintiff relies upon poor lighting as a basis for liability, that aspect of his claim fails as a matter of law.

month. While Plaintiff alleged that he lacked access to a toilet during this time (Am. Compl. ¶¶ 20-22; TAC ¶¶ 42-45), he admitted during his deposition that a cell on the range was left open for inmates to have access to a toilet (McLaughlin Dep. (ECF No. 120 Ex. 1) 19-20).[14] Other than his refuted allegation that he did not have access to a toilet, Plaintiff cites no other factual basis to support a claim that overcrowded conditions or his resulting temporary housing represented a Fourteenth Amendment violation. As Defendants note, being lodged temporarily with more people than a jail's intended design does not rise to the level of a constitutional violation. *See Toomer v. Camden County Corr. Facility*, 2017 WL 2483700, at *3 (D.N.J. June 8, 2017) (double-bunking did not violate the Eighth Amendment or the due process clause of the Fourteenth Amendment); and *Hubbard II*, 538 F.3d at 236 (noting that neither the Supreme Court nor the Third Circuit had clearly established a right of pretrial detainees to be free from triple-celling or from sleeping on a mattress placed on the floor).

Rather, it is other conditions both on the C Range and other parts of the prison in which Plaintiff was lodged that are central to his Fourteenth Amendment claim.

According to Plaintiff's sworn testimony, his bedding in the C Range was infested with vermin and excrement. Leeches came up through the shower drain. The jail was infested with rodents, cockroaches, rats, mice, spiders, worms and gnats.[15]

---

[14] If Plaintiff's assertions in the Amended Complaint are directly contradicted by his deposition testimony, his deposition testimony controls, under the "sham affidavit" doctrine. *See Coit v. Garman*, 812 F. App'x 83, 87 (3d Cir. 2020).

[15] Defendants argue that, during his deposition, Plaintiff admitted that he only saw leeches in the shower drain and insects flying near the mop sink in the shower room; he did not testify that he saw or experienced any other vermin. The record does not support Defendants' conclusion that there is a lack of record evidence about the presence of other vermin, however. Plaintiff was responding to specific questions and was not asked about any other vermin. (McLaughlin Dep. (ECF No. 120 Ex. 1) 14:21.) As noted above, Plaintiff has provided other verified statements to support his claim about infestations at the FCP that are not directly contradicted by his deposition testimony. *See* Am. Compl. ¶¶ 28-29; TAC ¶¶ 51-52 (he was exposed to vermin and their

Defendants state that there is no evidence in the record that Plaintiff's exposure to insects caused any harm, jeopardized his health or caused the facility to be unfit for habitation. In support of their contention, they cite *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 467 (M.D. Pa. 2010) (inmate alleged that his cell was infested with insects but did not allege or produce evidence that any of the conditions in his cell jeopardized, or potentially jeopardized, his health, or caused the cell to be unfit for habitation). However, that case was analyzed under the Eighth Amendment. *See Tustin v. Strawn*, 2020 WL 1277661, at *4 & n.6 (W.D. Pa. Feb. 5, 2020), *report and recommendation adopted*, 2020 WL 1275748 (W.D. Pa. Mar. 17, 2020) (refusing to rely on *Mitchell* in a pretrial detainee case). By contrast, Plaintiff was a pretrial detainee during most of his confinement at the FCP. He is not required to prove a serious injury to establish a constitutional violation due conditions of confinement. *See Darnell*, 849 F.3d at 37.

Defendants also argue that Plaintiff cannot establish the necessary deliberate indifference to sustain this claim because he admitted that he saw C Range being fumigated on one occasion. The do not contend, however, that a single treatment over the six months that he was incarcerated at the FCP conclusively shows that they were not deliberately indifferent to this issue.[16] *See Darnell*, 849 F.3d at 39 (evidence of thrice-daily visits by cleaning crews and pest control visits established, at most, genuine issues of material fact as to the handling of sanitation issues at the prison). *See also Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (two pest-control sprayings in sixteen months may have been insufficient to deal with the condition that plaintiff alleged and did not necessarily refute his claim that  that the defendants were deliberately

---

excrement, and his bedding was infested with vermin and vermin excrement).

[16] As noted above, Defendants contend that the FCP was fumigated monthly, but because they rely on unauthenticated invoices that were not provided to Plaintiff during discovery, they will not be considered for purposes of their dispositive motion.

indifferent).

A review of the record shows that there are genuine issues of material fact regarding other conditions at the FCP. Among other things, Plaintiff testified under oath that while he was in the SMU, raw sewage came up through the drains. His toilet constantly leaked and could not be used for "days on end." Problems were temporarily fixed but then recurred. After he was moved back to the C Range, he had to relieve himself in plastic bags and sewage repeatedly ran from the upstairs cell down to C block and across the floor. According to Plaintiff, this had been going on for quite some time and was constant. The smell in the C Range was foul. At times the floors were covered with feces, that there was standing water consisting of urine in his cell and that the union asked for new boots due the existence of feces and urine on the floor.

Defendants contend that the plumbing issues at FCP were *de minimis*. For example, they allege that Plaintiff merely complained about a "leaky toilet." In support of their contention, Defendants cite *Ridgeway v. Guyton*, 663 F. App'x 203, 205 (3d Cir. 2016), in which the Court of Appeals concluded that an inmate who identified only a single date on which a toilet overflowed could not state an Eighth Amendment claim for an "objectively sufficiently serious injury." The *Ridgeway* court contrasted that situation with that in another case in which a prisoner was "forced to remain in a feces-covered cell for three days." *Id.* (citing *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001)).

Plaintiff has identified conditions that, taken as true, can be characterized as more serious than those at issue in *Ridgeway* and more akin to those in *McBride. See also Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days in a stench that not even a fellow prisoner could stand."), *superseded by statute on other grounds, see Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir.

2000). Moreover, as a pretrial detainee, Plaintiff does not have to prove a serious injury.

Defendants also contend that the unsanitary conditions to which Plaintiff was exposed lasted, at most, a few hours at a time. They reference a decision in which the Third Circuit noted that while a several-hour delay in providing sanitary products may have resulted in some discomfort, it was "de minimis, and certainly not sufficiently serious to implicate [plaintiff's] constitutional rights." *Brown v. Hamilton Twp. Police Dep't Mercer County, N.J.*, 547 F. App'x 96, 98 (3d Cir. 2013).

These are controverted issues, however. While Defendants emphasize certain occasions in which Plaintiff's conditions were promptly resolved, they do not address the recurring issues raised by Plaintiff.

Simply put, there are disputed issues of fact regarding the nature and extent to which Plaintiff experienced repeated and ongoing exposure to unsanitary conditions at the Fayette County Prison during Plaintiff's incarceration there. Viewing those facts most favorably to Plaintiff, whether these conditions rise to the level of a constitutional deprivation under the Fourteenth Amendment cannot be resolved as a matter of law.

2. Deliberate Indifference

Defendants contend that a prison official acts with deliberate indifference to a prisoner's needs only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). They argue that because Plaintiff admits that they tried to address the conditions he identifies, they were not "deliberately indifferent."

This does not necessarily follow, however. *See Darnell*, 849 F.3d at 39 (the evidence about regularly scheduled cleanings and pest control visits, at best, established that there were genuine disputes as to material facts about the handling of sanitation issues at the prison). Although

Defendants may have responded to various problems (although not as quickly as they seem to suggest), they have not addressed the reoccurrence of these problems over an extended period of time, which Plaintiff describes as a "constant" issue.

Moreover, although "deliberate indifference" in an Eighth Amendment claim incorporates a subjective element that the prison official must be aware of the substantial risk of serious harm and must draw that inference, the same is not true of due process claims brought by pretrial detainees under the Fourteenth Amendment. Rather:

> to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively.

*Darnell*, 849 F.3d at 35.

Accepting Plaintiff's version of the uncontroverted facts as true, he has provided evidence of ongoing unsafe and unsanitary conditions, including exposure to insects and vermin, and the presence of urine, feces and raw sewage in his cell. The evidence of record also reflects that prison officials necessarily were aware of the problems, since they endeavored at times to correct them, but did not resolve them other than on a temporary basis. Indeed, these conditions persisted throughout Plaintiff's incarceration. Thus, a jury must determine if this represents a reckless failure to act with reasonable care to mitigate the risk that these conditions posed to Plaintiff, and whether prison officials knew, or should have known, that these conditions posed an excessive risk to health or safety. Thus, whether defendants were deliberately indifferent to the safety and welfare of Plaintiff cannot be determined based upon the evidence of record.

B. Eighth Amendment

Finally, to the extent that Plaintiff was a convicted prisoner for the last several weeks of his incarceration at the FCP, Defendants have not demonstrated that they are entitled to judgment as a matter of law regarding his claim under the Eighth Amendment. As the record reflects, there are disputed issues of material fact concerning the elements of this claim, including whether "prison conditions deprived him of life's minimum necessities, that the deprivation was sufficiently serious, and that a prison official acted with deliberate indifference in subjecting him to that deprivation." *Renchenski v. Williams*, 622 F.3d 315, 338 (3d Cir. 2010) (internal quotation marks omitted).

C. Liability of Individual Defendants

Plaintiff has asserted claims against Defendants Smith, Lenkey, Miller and Zavada in their individual capacities. In order to establish personal liability in a § 1983 action, "it is enough to show that the official, acting under color state of law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

Defendants argue that Plaintiff cannot maintain a claim arising out of the conditions of confinement against Lt. Smith and Lt. Lenkey in their individual capacities because they had no involvement in creating the conditions. Defendants contend that "Plaintiff specifically acknowledges that these individuals were not individually responsible for the alleged conditions he experienced." (ECF No. 118 at 12). In his deposition, Plaintiff testified that: Lt. Smith was "a great guy" who "[came] to my aid several times and asked me what he could do." The record also reflects that Lt. Smith was aware of the conditions at the FCP and had the power to move Plaintiff to a different cell, which he did only on one occasion.

Similarly, Lt. Lenkey was aware of the conditions at the FCP and also had the power to

move him to a different cell but Plaintiff could not recall if he did so. Plaintiff also testified that Lenkey was sympathetic "but there's only so much they can do, again, without going to the top. Unfortunately, when we went up to the top, it just never seemed to pan out well." (McLaughlin Dep. 76-79.)

Construing this testimony in the light most favorable to Plaintiff as the non-moving party, he appears to acknowledge that Smith and Lenkey were sympathetic to his situation, but both had the power to move him to a different cell (which Smith did only once) and to report the conditions up the chain of command, which they may or may not have done. Defendants have not proffered affidavits or any other evidence to show that they either took further action or lacked the power, authority or ability to take further action to respond to or remedy Plaintiff's complaints or the conditions to which he was exposed. Thus, whether either of these defendants deprived Plaintiff of a federal right, that is, exposure to prison conditions that deprived him of life's minimum necessities, is a disputed issue of fact. To be clear, while neither Lt. Smith nor Lt. Lenkey caused the allegedly unsanitary conditions in the prison, whether they deprived Plaintiff of his rights by not moving him to a cell or area of the FCP where he would not be exposed to these conditions remains an issue in this case. Thus, based on the present record, there are genuine issues of material fact as to their individual liability.

Further, Defendants contend, Plaintiff cannot maintain a claim against Warden Miller or Deputy Warden Zavada because they did not know about these conditions. They cite *Newkirk v. Sheers*, 834 F. Supp. 772, 786 (E.D. Pa. 1993), in which the court held that the warden and deputy warden could be held liable in their individual capacities for conditions of which they were aware. *Id.* at 784.

Plaintiff admitted that he did not see or speak to either Warden Miller or Deputy Warden

Zavada during his incarceration at the FCP. But this fails to show that these individuals did not know about the conditions at the prison. Defendants have not submitted any evidence to show that they did not know about these conditions. Indeed, it defies logic to suggest that either Warden Miller or Deputy Warden Zavada was unaware of conditions that allegedly existed for months in the FCP. Moreover, Plaintiff suggests that these individuals were aware of the conditions to which he was allegedly subjected through personal observation, notices and grievances, and still took no action. He also notes that Warden Miller posted several video recordings on the internet detailing the conditions at the FCP, including some of the issues Plaintiff has raised here. (Am. Compl. ¶ 105; TAC ¶ 132.) Whether either defendant could have acted to remedy Plaintiff's conditions remains a contested issue. Therefore, Warden Miller and Deputy Warden Zavada are not entitled to summary judgment.

Thus, with respect to Warden Miller, Deputy Warden Zavada, Lt. Smith and Lt. Lenkey, Defendants' motion for summary judgment will be denied.

D. Liability of Fayette County

Defendants contend that Plaintiff has identified no basis for municipal liability against Fayette County because the County cannot be vicariously liable for the unconstitutional acts of its employees. *Monell v. Department of Social Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Groman v. City of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995). Rather, they contend, it can only be liable under § 1983 if it maintained a policy, practice or custom that harmed Plaintiff. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).

The Court of Appeals has recognized that allowing long-standing unconstitutional conditions of confinement to continue may reflect a custom for 1983 purposes. *See Anela v. City of Wildwood*, 790 F.2d 1063, 1069 (3d Cir. 1986) (holding that jail's long-standing conditions of

confinement constituted a city "custom or usage" for *Monell* purposes); *Bowers v. City of Phila.*, 2008 WL 5210256, *6 (E.D. Pa. Dec. 12, 2008) (same). Among other things, Plaintiff has testified that during the six months he was incarcerated in the FCP, its plumbing was frequently backed up, with raw sewage coming up through the drains on the floor. There was raw sewage in the cells and leaking toilets that frequently were not operational. Leeches surfaced through the shower drain. There were times when inmates had to use plastic garbage bags for relieving themselves, there was a foul stench and at times the floors were covered with feces and urine to the degree that the union asked for new boots.

It is a question for the jury as to whether these conditions reflect an unconstitutional policy, practice or custom on the part of Fayette County. Thus, with respect to Plaintiff's Fourteenth and Eighth Amendment claims against Fayette County, Defendants' motion for summary judgment will be denied.

E. Retaliation Claim

Plaintiff alleges that in violation of his First Amendment rights, Deputy Warden Zavada retaliated against him by housing him in deplorable conditions in the SMU because of a fight in which they had been involved twenty years before. Defendants contend that this claim should be dismissed because Plaintiff did not exhaust it and further, because he cannot meet the elements necessary to maintain it.[17]

The Prison Litigation Reform Act ("PLRA") provides that:

> No action shall be brought with respect to prison conditions under section
> 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison,

---

[17] Notably, Defendants do not assert that Plaintiff failed to exhaust his administrative remedies with respect to his other claims. As the Court of Appeals has stated, "the defendant must prove that the prisoner-plaintiff failed to exhaust each of his claims. There is no 'total exhaustion' rule permitting dismissal of an entire action because of one unexhausted claim." *Small v. Camden County*, 728 F.3d 265, 269 (3d Cir. 2013).

or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)(a). The Supreme Court has held that prisoners must exhaust their administrative remedies before bringing suit, and the Court of Appeals has applied this rule even in cases raising claims of retaliation. *See Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *Turner v. Secretary, Pa. Dep't of Corr.*, 683 F. App'x 180 (3d Cir. 2017). Whether a prisoner has exhausted administrative remedies is a question of law to be determined by the court, even if that determination requires the resolution of disputed facts. *Small v. Camden County*, 728 F.3d 265, 269 (3d Cir. 2013).

It is not the plaintiff's burden to affirmatively plead exhaustion. *Jones v. Bock*, 549 U.S. 199, 217 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, the failure to exhaust must be asserted and proven by the defendants. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Defendants contend that Plaintiff did not file a grievance concerning his retaliation claim, and as such, he failed to exhaust his administrative remedies. Their support for this contention is Plaintiff's deposition testimony, in which he was asked about the grievances he had submitted. After he identified three other grievances, he was asked if he could think of any others, to which he responded "no, there were none." He was not specifically asked if he filed a grievance regarding the alleged retaliation. Defendants submitted no other evidence on this issue, including an affidavit from anyone at the FCP that represent that Plaintiff never filed a grievance about this issue. *See, e.g.*, *Veasey v. Fisher*, 307 F. App'x 614, 615 (3d Cir. 2009) (affidavit of grievance coordinator showed that plaintiff had not filed a grievance about the issue). In fact, while Defendants state that "[o]bviously, a grievance policy existed" (ECF No. 118 at 14), they have not submitted their

grievance policy or even described its terms or process. Rather, they appear to rely on Plaintiff's understanding of the policy, which includes his testimony that there was a "lack of grievance process" and that he never received a response to any of his other grievances.

The PLRA requires only "proper exhaustion," meaning exhaustion of those administrative remedies that are "available." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The Supreme Court has identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S.Ct. 1850, 1859-60 (2016). *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable). The Court of Appeals further has held that "as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019).

Defendants have the initial burden of demonstrating that Plaintiff failed to resort to the available administrative remedies. *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). The Court of Appeals has explained that if the defendant demonstrates that the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her." *West v. Emig*,

787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment." *Id.*

While Plaintiff testified that he did not file a grievance on this issue, the Court cannot conclude that his claim must be dismissed for failure to exhaust. There is no record evidence at all regarding the parameters of any grievance policy at the FCP. Defendants did not supply a grievance policy as part of the record or provide any evidence about the required process. The only evidence in the record about any grievance process came from Plaintiff, who testified that any grievances that he did submit was ignored. Based upon the present record, it appears that any grievance policy that may have existed at the FCP merely operated as a dead end. If the grievance process was, in essence, unavailable to Plaintiff, then his failure to file a grievance regarding retaliation cannot be the basis for summary judgment, especially in the absence of any evidence from Defendants, who have the burden of proof, about the nature of the policy or evidence, beyond Plaintiff's memory, that he failed to submit one. Simply put, Defendants have not met their burden.

Turning to the elements of a prima facie retaliation claim, Plaintiff must show that: (1) he engaged in constitutionally protected activity; (2) he suffered an adverse action that would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take the adverse action. *Bistrian*, 696 F.3d at 376; *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001).

Defendants argue that Plaintiff cannot satisfy the first element of this claim because getting into a fight is not a constitutionally protected activity.[18] That is not a fair reading of his claim,

---

[18] Defendants made this argument in their motion to dismiss the SAC and the Court explicitly rejected it.

however. Rather, Plaintiff states that he was told that Zavada was retaliating against him by placing him in the SMU, or at least keeping him there for no reason, because he had "ribbed" Zavada over the years about the fight they had gotten into. His protected activity consisted of speaking out "over the years," not engaging in a fight.

Defendants also contend that the claim should be dismissed because the fight that occurred twenty years before is too distant to establish temporal proximity and because the record establishes that Plaintiff was put in the SMU to protect him after he was attacked by another inmate. However, these contentions are not supported by the record. Plaintiff stated that he "ribbed" Zavada over the years about their fight and that was the basis for Zavada retaliating against him. Moreover, at best, there is conflicting evidence in the record about why Plaintiff was placed in the SMU. Plaintiff was told both that he was placed in the SMU to protect him from further injury after he was punched by another inmate, and that Zavada was keeping him there because he was "an asshole." Thus, because there are genuine issues of material fact with respect to the retaliation claim, Defendants' motion for summary judgment will be denied.

## V. Conclusion

For these reasons, Defendants' motion for summary judgment will be granted only to the extent that Plaintiff's Fourteenth and Eighth Amendment claims rely on his allegations related to overcrowded conditions, his temporary housing at the beginning of his incarceration and inadequate lighting, and denied in all other respects.

An appropriate order follows.

Dated: June 21, 2021                                              BY THE COURT:

                                                                  /s/ Patricia L. Dodge
                                                                  PATRICIA L. DODGE
                                                                  United States Magistrate Judge

cc:     William McLaughlin
         NU-1570
         SCI Benner Township
         301 Institution Dr.
         Bellefonte, PA 16823-1665